**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **CHARM CITY HEMP, LLC,** *et al.,* | |
| *Plaintiffs*, | |
| **v.** | **Civil No.: 1:25-cv-01744-JRR** |
| **GOVERNOR WES MOORE,** *et al.*, | |
| *Defendants.* | |

## <u>MEMORANDUM OPINION</u>

This matter comes before the court on Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction. (ECF No. 6; the "Motion.") No hearing is necessary. Local Rule 105.6 (D. Md. 2025). For the reasons set forth below, by separate order, the Motion will be denied and the hearing scheduled for August 7, 2025, will be canceled.

## I.    BACKGROUND

Plaintiffs—a collection of hemp farmers, hemp retailers, an advocacy organization formed on behalf of hemp farmers, and a consumer of hemp products—bring the instant action to enjoin Defendants—the State of Maryland, the Governor of Maryland, the Maryland Cannabis Administration and its executive director, and the Maryland Alcohol, Tobacco, and Cannabis Commission and its executive director (collectively, the "State Defendants") and the Commissioner of the Baltimore City Police Department—from enforcing various provisions of Maryland law and regulations relating to hemp and cannabis products.

1

### A. Parties

Plaintiff Maryland Hemp Coalition, Inc. ("MHC") is a non-profit member organization of hemp farmers.  MHC's mission is to "forward the cause of farmers of hemp in the State of Maryland."  (ECF No. 1 ¶ 4.)

Plaintiff Charm City Hemp, LLC, d/b/a Charm City Hemp, is a Maryland registered Limited Liability Company and retailer of hemp products sold in Baltimore, Maryland.[1]  *Id*. ¶ 5. Charm City Hemp does not have a license, as required by Maryland law, to engage in retail sales of cannabis products.  *Id*.

Plaintiff Endo Productions Company is a Pennsylvania Limited Liability Company that produces and distributes Tetrahydrocannabinol ("THC")-infused beverages.  Endo Productions Company markets and distributes these beverages in Maryland, but it does not have a Maryland cannabis license.  *Id*. ¶ 6.

Plaintiff J. Wyand, Inc., d/b/a Simple Pleasures, is a West Virginia corporation with a Maryland registered trade name and a retail store selling hemp-derived products in Hagerstown, Maryland.  Simple Pleasures does not have a Maryland cannabis license.  *Id*. ¶ 7.

Plaintiff Ira Cooke is an individual customer of Simple Pleasures.  *Id*. ¶ 13.

Plaintiff South Mountain Microfarm, LLC, is a Maryland agricultural business that grows hemp plants, processes hemp plants, and distributes hemp-derived products to retailers in Maryland.  South Mountain Microfarm also retails its products directly to consumers.  Its products include hemp-derived beverages.  It does not have a State of Maryland cannabis license.  *Id*. ¶ 8.

---

[1] Defendants allege, and Plaintiffs do not dispute, that as of July 1, 2025, Plaintiff Charm City Hemp, LLC, was not in good standing as a Maryland LLC.  The court conducted a search for Charm City, LLC, in the Maryland Business Entity Search of which it is entitled to take judicial notice as a government public website (https://egov.maryland.gov/businessexpress/entitysearch, last accessed July 30, 2025).  The search results indicate that Plaintiff is still not in good standing.  A Maryland LLC not in good standing is ineligible to bring suit in federal court. *United Corrosion Control, LLC v. Carboline Co.*, No. 22-1423, 2023 WL 8712048, at *2–3 (4th Cir. Dec. 18, 2023).

Plaintiff Peace of Sunshine, LLC, d/b/a Peace of Sunshine, is a Maryland LLC that retails hemp products in Catonsville, Maryland, without a Maryland State license to do so. (ECF No. 1 ¶ 9.)

Plaintiff Straf, LLC, d/b/a Peace of Crofton, is a Maryland LLC that retails hemp products in Crofton, Maryland, without a Maryland license to do so. *Id*. ¶ 10.

Plaintiff Cannon Apothecary, LLC, d/b/a/ Cannon Ball Dispensary, is a Maryland LLC that retails hemp products in Lusby, Maryland, without a Maryland license to do so. *Id*. ¶ 11.

Plaintiff The Unlimited Experience Holding Company, LLC, d/b/a The Southern Maryland Experience, is a Maryland LLC that retails hemp products in Hollywood, Maryland, without a Maryland license to do so. *Id*. ¶ 12.

Defendants are Wes Moore, Governor of Maryland; the Maryland Cannabis Administration; the Executive Director of the Maryland Cannabis Administration; the Maryland Alcohol, Tobacco, and Cannabis Commission; the Executive Director of the Maryland Alcohol, Tobacco, and Cannabis Commission; the Commissioner of the Baltimore City Police Department; and "various other persons who either have regulatory authority under the State of Maryland's cannabis licensing laws, or who have taken unlawful action in furthering the enforcement of the State of Maryland's cannabis licensing regime." (ECF No. 1 ¶ 14.) All individual Defendants are sued in their official capacities only. *Id*.

## B. Statutory and Factual Background

Pursuant to the Controlled Substances Act ("CSA"), the use, distribution, manufacture, and possession of cannabis, also known as marijuana, is federally illegal. 21 U.S.C. § 801 *et seq*. Cannabis and hemp are both derived from the Cannabis sativa L. plant. Importantly, since 2018, the distribution, manufacture, and possession of hemp, defined as a Cannabis Sativa plant with a

delta-9 THC concentration of not more than 0.3 percent, is not prohibited by federal law.[2] 7 U.S.C. § 1639o. The Agricultural Improvement Act (known as the "Farm Act") distinguishes hemp from cannabis and authorizes states to implement their own agricultural programs related to the production of hemp products. *Id*. § 1639p(a)(3).

### 1. *The Maryland Cannabis Reform Act (2023)*

In 2023, the Maryland legislature passed the Cannabis Reform Act ("CRA") that comprehensively overhauled cannabis and hemp regulation in the State. Two developments precipitated the passage of the CRA: Maryland citizens' 2022 vote to amend the Maryland Constitution to legalize recreational marijuana use, and the proliferation of unregulated, intoxicating hemp products following the Farm Act. (ECF No. 20 at pp. 10–11 (quoting Maryland House Economic Matters Committee C.T. Wilson noting the marketplace of hemp products developed "merely to get someone high, which was never the intent of this legislature").) Pertinent to this action, the CRA amended the Maryland Code to implement new standards for defining hemp, provide for recreational cannabis retail, growing, and processing licenses, and create the Maryland Cannabis Administration ("MCA") to regulate the cannabis industry in the state.[3]

As it relates to the hemp products Plaintiffs manufacture and retail, the CRA provides:

> (b)(1) A person may not sell or distribute a product intended for human consumption or inhalation that contains more than 0.5 milligrams of tetrahydrocannabinol per serving or 2.5 milligrams of tetrahydrocannabinol per package unless the person is licensed under § 36-401 of this title
>
> .        .        .
>
> (d)(1) Notwithstanding subsection (b) of this section and subject to paragraph (2) of this subsection, it is not a violation of this section

---

[2] The parties dispute whether testing to determine the THC concentration of a Cannabis plant must occur at a specified time. For the reasons set forth below, this dispute is immaterial to Plaintiff's likelihood of success on the merits of their claims or to any other facet of the court's analysis. Accordingly, the court does not reach the parties' arguments regarding whether hemp must be tested at 30 days or any other time.

[3] Previously, an entity called the Maryland Medical Cannabis Commission oversaw licensing and regulation of medical marijuana distributors. Maryland legalized medical marijuana in 2014.

> for a person to sell or distribute a hemp-derived tincture intended for
> human consumption that contains:
>
> (i) a ratio of cannabidiol to tetrahydrocannabinol of at least 15 to 1;
> and
> (ii) 2.5 milligrams or less of tetrahydrocannabinol per serving and
> 100 milligrams or less of tetrahydrocannabinol per package.
>
> (2) To sell or distribute a hemp-derived tincture under this
> subsection, a person must provide, as required by the
> Administration, tincture samples for the purpose of testing to
> determine chemical potency and composition levels and to detect
> and quantify contaminants.
>
> (e) A person who violates subsection (b) of this section:
>
> (1) may be charged by a citation; and
> (2) is guilty of a misdemeanor and on conviction is subject to a fine
> not exceeding $5,000.

MD. CODE ANN., ALC. BEV. § 36-1102(b)–(e).  Plaintiffs allege that their products, "while being

derived from hemp and not marijuana, and therefore lawful under Federal Law pursuant to the

2018 Farm Bill, cannot meet the new standard for maximum milligrams of THC imposed by" the

CRA.  (ECF No. 1 ¶ 30.)  Accordingly, "the Plaintiff retailers are required under Maryland's

Cannabis Reform Act to obtain a recreational cannabis license under the Act."  *Id*. ¶ 31.

Pursuant to the CRA, recreational cannabis licensing proceeded in two rounds: the first to

begin before January 1, 2024, and the second to begin after May 1, 2024.  MD. CODE ANN., ALC.

BEV. § 36-404(a)(1), (2).[4]

> (d)(1) For the first round, subject to paragraphs (2) and (3) of this
> subsection, the Administration shall enter each social equity
> applicant that meets the minimum qualifications established by the
> Administration into a lottery and issue to social equity applicants
> not more than:
>
> (i) for standard licenses:

---

[4] The CRA also provided that on or before July 1, 2023, medical growers, processors, and dispensaries could convert
their licenses to licenses to operate medical and recreational cannabis businesses.  MD. CODE ANN., ALC. BEV. § 36-
401(b)(1).  No Plaintiff was previously licensed as a medical marijuana grower, processor, or dispensary.

1. 20 grower licenses;
2. 40 processor licenses; and
3. 80 dispensary licenses;

(ii) for micro licenses:
1. 30 grower licenses;
2. 30 processor licenses; and
3. 10 dispensary licenses; and

(iii) 10 incubator space licenses.

(2) The Administration shall determine whether an application meets the minimum qualifications for the lottery on a pass-fail basis, as determined by the Administration, after evaluating:

(i) a detailed operational plan for the safe, secure, and effective cultivation, manufacture, or dispensing of cannabis;

(ii) a business plan demonstrating a likelihood of success and sufficient business ability and experience on the part of the applicant, and providing for appropriate employee working conditions; and

(iii) a detailed diversity plan.

(3)(i) If an applicant seeking social equity status is from out of state, the applicant must submit with the application evidence that the applicant meets the criteria for a social equity applicant established under this title before the Administration may consider the application.

(ii) First round application submissions for all license types are limited to social equity applicants.

*Id.* § 36-404(d)(1)–(3).

"Social equity applicants" are defined as:

[A]n applicant for a cannabis license or cannabis registration that:
(1) has at least 65% ownership and control held by one or more individuals who:

(i) have lived in a disproportionately impacted area for at least 5 of the 10 years immediately preceding the submission of the application;

> (ii) attended a public school in a disproportionately impacted area for at least 5 years; or
>
> (iii) for at least 2 years, attended a 4-year institution of higher education in the State where at least 40% of the individuals who attend the institution of higher education are eligible for a Pell Grant; or
>
> (2) meets any other criteria established by the Administration.

*Id*. § 36-101(ff). "Disproportionately affected area" is defined as "a geographic area identified by the office of social equity that has had above 150% of the state's 10-year average for cannabis possession charges." *Id*. § 36-101(r).

Following passage of the CRA, some, but not all, Plaintiffs brought an action in the Circuit Court for Washington County, Maryland, on July 24, 2023 (Case No C-21-CV-23-348). (ECF No. 1 ¶ 57.) The State court action plaintiffs alleged violations of state law only. *Id*. ¶ 58. In that case, the Circuit Court entered a preliminary injunction enjoining the State from "enforcing Maryland Code Ann. Alc. Bev. § 36-1102 against any person who was already lawfully in the business of selling hemp derived products prior to July 1, 2023." (ECF No. 6-3.) This injunction did not, however, enjoin the State from proceeding with the licensing scheme described in the CRA. An appeal of the preliminary injunction order is currently pending before the Appellate Court of Maryland. (ECF No. 20 at p. 17.)

As part of the first round of licensing, the MCA conducted two lotteries. (ECF No. 20 at p. 18.) No Plaintiff applied for the first round of licensing, and therefore none received a license during same. (ECF No. 1 ¶ 69.) The second round of licensing will not occur until the State performs and analyzes a disparity study to determine whether remedial measures are required. MD. CODE ANN., ALC. BEV. § 36-404(e)–(g). To the court's knowledge, at the time of this writing, this study is ongoing; thus, the terms for accepting license applications for the second round have

not yet been set, and the application process has not begun. (ECF No. 20 at p. 18; ECF No. 1 ¶ 50.)

### 2. *Senate Bill 215 (2025)*

During its 2025 session, the Maryland General Assembly passed Senate Bill 215. 2025 Md. Law ch. 120. The Bill became law on July 1, 2025, and provides that licenses for on-site cannabis consumption sites shall be awarded through the same process as second round grower, processor, and dispensary licenses are awarded. 2025 Md. Law ch. 120 § 36-404(g)(iv). Bill 215 does not alter the CRA's provision that the second round of licensing will proceed only after the MCA completes a study as to whether further social equity programs are needed. MD. CODE ANN., ALC. BEV. § 36-404(e)–(g). Accordingly, like with the second round licenses, the application criteria for the on-site consumption site licenses has yet to be determined. In preparation for the licensure of on-site consumption sites, the Bill defines "cannabinoid beverages," the State Defendants submit, for the limited purpose of "clarify[ing] what an on-site consumption site may serve when it becomes operational." *Id.* § 36-101(C-1); ECF No. 20 at p. 21. To be clear, Senate Bill 215 does not alter the licensing procedure for the second round of licensing set forth in the CRA. As of this writing, the second round of licensing has yet to commence, and the MCA has not yet determined the criteria for applying for same.

### 3. *Edible Products and Beverages, Shelf Space Requirement, and Marijuana Enforcement Tracking Regulation and Compliance*

In the Complaint, in addition to their challenge of the CRA's licensing requirements, Plaintiffs challenge the below-described aspects of the CRA and cannabis regulation in Maryland.

First, Plaintiffs allege that Maryland recently changed the regulations regarding edible cannabis products and restricted their sale to licensed dispensaries. (ECF No. 1 ¶ 71, 73.) Per MCA's regulations, to process, sell, or distribute edible cannabis products in Maryland, a licensed

processor must obtain a permit from the MCA.  COMAR 14.17.13.05A(1).  MCA additionally regulates certain qualities of edible cannabis products, including shape and ingredients.  COMAR 14.17.13.05(C)(1)–(3); 14.17.13.05E.  Maryland also permits the sale of liquid edibles (*i.e.* THC beverages) subject to certain MCA regulations.  COMAR 14.17.13.05D.

The State Defendants maintain that neither Maryland law nor MCA regulation restricts the ability to retail edible cannabis products to only dispensaries licensed under the CRA.  (ECF No. 20 at pp. 19–20.)  Senate Bill 215 does not alter the law or regulations related to the retail of edible cannabis products; to the extent it references cannabinoid beverages, the State Defendants insist the Act's new definition of same is for the purpose of "clarify[ing] the authority of an on-site consumption site to process single serving products and repackage products for purposes of creating single serving products."  (ECF No. 20 at p. 21.)

Second, Plaintiffs challenge the CRA and MCA regulations requiring dispensaries licensed before December 31, 2022, to ensure that 25% of cannabis products available for retail come from a combination of social equity licensees and licensees that share no common ownership interest or control with the dispensary license holder.  (ECF No. 1 ¶ 106.)  *See* MD. CODE ANN., ALC. BEV. § 36-401(a)(3).  This requirement explicitly concerns cannabis products, and does not mention hemp products or impose similar requirements on the sale of hemp-derived products.

Third, Plaintiffs assert that the State's use of the Marijuana Enforcement Tracking Regulation and Compliance ("METRC") system, and Plaintiffs' inability to use the system as non-licensees, "lock[s] them out from doing legitimate business with state licensed dispensaries, [and] is a violation of the equal protection requirements of the Fourteenth Amendment to the United States Constitution."  (ECF No. 1 at p. 34.)  METRC is a third party system contracted by the MCA to provide track and trace technology for cannabis plants.  (ECF No. 20 at p. 20.)  METRC

is a service available to licensed cannabis producers and distributors. If a Maryland cannabis licensee purchased hemp from an un-licensed source, like Plaintiff farmers, the licensee would enter the product into METRC's system. *See* COMAR 14.17.11.03(B)(2) (providing that a processor may acquire hemp from a person licensed to produce hemp by the Maryland Department of Agriculture or the Secretary of the U.S. Department of Agriculture, or an agency of another state pursuant to a hemp production plan that has been approved by the Secretary of the U.S. Department of Agriculture); ECF No. 20-8, State Court Testimony of William Tilburg *Maryland Hemp Coalition, v. Governor Wes Moore* (Case No. C-21-CV-23-348) at pp. 7–8.

### 4. *Spring 2025 Enforcement Actions*

Plaintiffs allege that in the weeks leading up to the filing of this action, local law enforcement agencies in Baltimore City and Harford County "acting at the request and with the cooperation of the Maryland Alcohol, Tobacco, and Cannabis Commission" conducted searches, seizures, and brought enforcement actions against retailers of hemp product. (ECF No. 6 ¶ 42.) Agents seized product from "several hemp retailers in Baltimore City" and, in at least one instance, brought criminal charges for the sale of cannabis based on lab analysis of the seized product. *Id*. ¶ 43. Plaintiffs do not allege they were subject to any search, seizure, or criminal action. Instead, they urge that "Plaintiffs who engage in the sale of hemp flower have a reasonable apprehension that they may be targeted for similar unlawful searches, seizures and enforcement actions, and seek an injunction and declaratory judgment that such seizures are unlawful." *Id*. ¶ 46.

### C.  Procedural Posture

Plaintiffs filed this action on June 2, 2025 (ECF No. 1). The Complaint sets forth the following counts:

> Count I: Declaratory Judgment And Injunctive Relief - Violation Of
> Rights To Equal Protection Of The Law Under Fourteenth

10

Amendment (Discrimination In Ability To Acquire A License) And Under 42 U.S.C. § 1983;

Count II: Declaratory Judgment And Injunctive Relief - Violation Of Right To Due Process Of Law Under Fourteenth Amendment And Violation Of Civil Rights Pursuant To 42 U.S.C. § 1983;

Count III: Declaratory Judgment And Injunctive Relief - Violation Of Dormant Commerce Clause And Violation Of Civil Rights Under 42 U.S.C. § 1983; and

Count IV: Taking Without Just Compensation Under Fourteenth Amendment Of The United States Constitution And Violation Of Civil Rights Pursuant To 42 U.S.C. § 1983.

(ECF No. 1 at pp. 32–39.)

With each count, Plaintiffs include numerous, distinct requests for declaratory judgment.

These sub-requests at Counts I and II are nearly identical:

The Plaintiffs pray that this Court enter a declaratory judgment that:

A. The State of Maryland social equity restrictions upon licensure were and are in violation of the equal protection requirements [and due process requirements] of the Fourteenth Amendment of the United States Constitution. The Plaintiffs further pray that the Court order appropriate injunctive relief.

B. The State of Maryland numerical restrictions upon licensure were and are in violation of the equal protection requirements [and due process requirements] of the Fourteenth Amendment of the United States Constitution. The Plaintiffs further pray that the Court order appropriate injunctive relief.

C. The State of Maryland "lottery system" for licensure is and was in violation of the equal protection requirements [and due process requirements] of the Fourteenth Amendment of the United States Constitution. The Plaintiffs further pray that the Court order appropriate injunctive relief.

D. The selective enforcement of erroneous testing standards, contrary to State and Federal Regulations as to hemp flower products, against the hemp retailers and not against state licensed dispensaries, is in violation of the equal protection requirements [and due process requirements] of the Fourteenth Amendment of the

United States Constitution. The Plaintiffs further pray that appropriate injunctive relief be granted.

E. That the State policies denying access to the METRC system to the Plaintiffs, thereby locking them out from doing legitimate business with state licensed dispensaries, is a violation of the equal protection requirements [and due process requirements] of the Fourteenth Amendment to the United States Constitution. The Plaintiffs further pray that appropriate injunctive relief be granted.

F. The requirement of a "detailed diversity statement" and business plan as part of the licensing review process, without any oversight to prevent arbitrary or capricious determinations of eligibility, are in violation of the equal protection requirements of the Fourteenth Amendment to the United States Constitution. The Plaintiffs further pray that appropriate injunctive relief be granted.

G. That the State policies allowing the sale of Federally lawful THC infused beverages, chocolates, and gummies by state licensed dispensaries, but not by the Plaintiffs, are in violation of the equal protection requirements of the Fourteenth Amendment to the United States Constitution. The Plaintiffs further pray that appropriate injunctive relief be granted.

(ECF No. 1 at pp. 33–34; 35–36.)

At Count III, Plaintiffs seek declaratory judgment that Defendants' restrictions on who may sell and manufacture THC infused beverage products, restrictions on licensure (including numerical restrictions and use of lottery system) as set forth in Counts I and II, "selective enforcement of erroneous testing standards," "State policies denying access to the METRC system to the Plaintiffs and others similarly situated," and "State policies allowing the sale of Federally lawful THC infused beverages, chocolates, and gummies by state licensed dispensaries, but not by the Plaintiffs," are in violation of the dormant Commerce Clause. *Id*. at pp. 37–38.

The court thus understands the bases for Plaintiffs' claims to fall into four categories: the recreational cannabis licensure requirements (including Social Equity Applicant criteria, numerical restrictions, lottery system, and diversity statement and business plan requirements);

METRC access; law enforcement seizure and testing of hemp flower; and alleged restriction of the ability to sell edible cannabis products (including THC beverages) to state licensed dispensaries only.

Following the Complaint, on June 16, 2025, Plaintiffs filed the Motion. (ECF No. 6.) Plaintiffs seek an injunction as to the first three counts of the Complaint, but not as to their Takings Clause claim (Count IV).  In the Motion, Plaintiffs request:

> A. That this Court issue a temporary restraining order and preliminary injunction that the Defendants must treat anyone in the business of selling Hemp Products before July 1, 2025, in the same way as they treat the State licensed Cannabis dispensaries, with all the same rights and privileges attaining to the state issued cannabis license, and,

> B. In the alternative, that the Defendants be enjoined from enforcing the present Cannabis Reform Act against those selling hemp products that are Federally lawful and are derived from Hemp Products, as provided by COMAR 15.01.17.10; and,

> C. That this Court enter a temporary restraining order and preliminary injunction that affirms the analysis of hemp products in accordance with the State of Maryland's own COMAR 15.01.17.10, that if tested 30 days or fewer preharvest, and with the issuance of a certificate of analysis by a reliable laboratory, that a product shall be deemed hemp and not cannabis and that to do otherwise is a violation of the equal protection clause and due process clause of the United State Constitution; and,

> D. That this Court enter a temporary restraining order and preliminary injunction declaring that there shall be an interstate market in Federally lawful hemp infused beverages and other Hemp Products, without regard for possession of a State issued cannabis license; and,

> E. That this Court enter a temporary restraining order and preliminary injunction against the Defendants issuing any additional cannabis licenses until the conditions of such issuance of licenses are determined to be fair and lawful; and,

> F. That this Court enter a temporary restraining order and preliminary injunction that the hemp retailers and the state cannabis

> licensees must be treated equally with state dispensaries in regard to
> the sale of Federally lawful hemp products.

(ECF No. 6 at pp. 30–31.)

On June 20, 2025, Judge Adam B. Abelson ordered the parties to meet and confer. and file a status report regarding: (a) whether the parties have agreed on a briefing schedule for Plaintiffs' Motion, and (b) if not, any competing proposals for a briefing schedule. (ECF No. 10.) This case was then reassigned to the undersigned. On July 3, the parties agreed to collapse Plaintiffs' request for temporary restraining order and preliminary injunction, submitted a proposed joint briefing schedule, and agreed to the scheduling of a preliminary injunction hearing on August 7. (ECF No. 21.) In accordance with the briefing schedule, State Defendants filed their opposition to the Motion on July 3 (ECF No. 20); and Defendant Richard Worley submitted a Motion to Dismiss on July 7 (ECF No. 22), which Plaintiffs oppose (ECF No. 28.)[5]

## II.    LEGAL STANDARD

"A preliminary injunction is 'an extraordinary remedy' that 'may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Pierce v. N. Carolina State Bd. of Elections*, 97 F.4th 194, 209 (4th Cir. 2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)); *see Benisek v. Lamone*, 585 U.S. 155, 158 (2018) (noting that "a preliminary injunction is 'an extraordinary remedy never awarded as of right'"). As such, preliminary injunctive relief is to be "granted only sparingly and in limited circumstances." *St. Michael's Media, Inc. v. Mayor & City Council of Baltimore*, 566 F. Supp. 3d 327, 351 (D. Md. 2021), *aff'd*, No. 21-2158, 2021 WL 6502219 (4th Cir. Nov. 3, 2021), and *aff'd*, No. 21-2206, 2021 WL 6502220 (4th Cir. Nov. 13, 2021) (quoting *Micro Strategy, Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001)).

---

[5] The court addresses Defendant Worley's Motion to Dismiss by separate memorandum opinion and order.

A plaintiff seeking preliminary injunctive relief "must establish that 1) they are likely to succeed on the merits; 2) they are likely to suffer irreparable harm absent preliminary relief; 3) the balance of the equities favors the requested injunctive relief; and 4) that relief is in the public interest."[6] *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 339 (4th Cir. 2021) (citing *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 170–71 (4th Cir. 2019)). These factors were established by the Supreme Court in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008). "[P]laintiff bears the burden of establishing that each of these factors supports granting the injunction."[7] *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991) (citing cases); *see St. Michael's Media, Inc.*, 566 F. Supp. 3d at 351 (same). As to likelihood of success on the merits, "[a]lthough plaintiffs need not establish a certainty of success, they must make a clear showing that they are likely to succeed at trial." *Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc.*, 131 F.4th 205, 223 (4th Cir. 2025) (quoting *Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020)).

## III.    ANALYSIS

### A.  Standing

The Constitution extends the judicial power of Article III courts to "cases" or "controversies." U.S. CONST. art. III, § 2, cl. 1. The doctrine of standing, among others, "implements" this limit. *Carney v. Adams*, 592 U.S. 53, 58 (2020). "Article III standing is 'part and parcel of the constitutional mandate that the judicial power of the United States extends only

---

[6] When a plaintiff seeks preliminary injunctive relief against the government, the balance of the equities and public interest factors merge. *Nken v. Holder*, 556 U.S. 418 (2009).

[7] "Because preliminary injunction proceedings are informal ones designed to prevent irreparable harm before a later trial governed by the full rigor of usual evidentiary standards, district courts may look to, and indeed in appropriate circumstances rely on, hearsay or other inadmissible evidence when deciding whether a preliminary injunction is warranted." *St. Michael's Media, Inc. v. Mayor & City Council of Baltimore*, 566 F. Supp. 3d 327, 352 (D. Md. 2021), *aff'd,* No. 21-2158, 2021 WL 6502219 (4th Cir. Nov. 3, 2021), and *aff'd,* No. 21-2206, 2021 WL 6502220 (4th Cir. Nov. 13, 2021) (quoting *G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.*, 822 F.3d 709, 725–26 (4th Cir. 2016)).

to cases and 'controversies.'" *Baehr v. Creig Northrop Team, P.C.*, 953 F.3d 244, 252 (4th Cir. 2020) (quoting *Libertarian Party of Virginia v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013)). Accordingly, as a threshold matter, the court must determine whether Plaintiffs have standing to bring this action.

To establish standing:

> First, the plaintiff must have suffered an injury in fact that is both concrete and particularized and actual or imminent, not conjectural or hypothetical. Second, the plaintiff's injury must be fairly traceable to the challenged action of the defendant, meaning that there must be a causal connection between the injury and the conduct complained of. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Dep't. of Educ v. Brown*, 600 U.S. 551, 561 (2023) (citations omitted) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).  Important here, an "abstract general interest common to all members of the public, no matter how sincere or deeply committed a plaintiff is to vindicating that general interest on behalf of the public," cannot establish an "injury in fact." *Carney*, 592 U.S. at 59.

Plaintiffs "must demonstrate standing 'with the manner and degree of evidence' required at the relevant 'stage[] of the litigation.'" *Fernandez v. RentGrow, Inc.*, 116 F.4th 288, 294 (4th Cir. 2024) (quoting *Lujan*, 504 U.S. at 561).  On a motion for preliminary injunction, "that means they 'must make a clear showing that they are likely to establish each element of standing.'" *Am. Fed'n of Tchrs. v. Bessent*, 772 F. Supp. 3d 608, 630 (D. Md. 2025) (quoting *Murthy v. Missouri*, 603 U.S. 43, 58 (2024)).

### 1. *Plaintiffs Lack Standing to Challenge CRA Licensing Requirements*

Plaintiffs' primary grievance is with the provisions of the CRA relating to applications for recreational cannabis licenses. In each of the three counts subject to the Motion, they seek declaratory judgment that:

> A. The State of Maryland social equity restrictions upon licensure were and are in violation of the equal protection [and due process] requirements of the Fourteenth Amendment of the United States Constitution. The Plaintiffs further pray that the Court order appropriate injunctive relief.
>
> B. The State of Maryland numerical restrictions upon licensure were and are in violation of the equal protection [and due process] requirements of the Fourteenth Amendment of the United States Constitution. The Plaintiffs further pray that the Court order appropriate injunctive relief.
>
> C. The State of Maryland "lottery system" for licensure is and was in violation of the equal protection [and due process] requirements of the Fourteenth Amendment of the United States Constitution. The Plaintiffs further pray that the Court order appropriate injunctive relief.
>
> .            .            .
>
> F. The requirement of a "detailed diversity statement" and business plan as part of the licensing review process, without any oversight to prevent arbitrary or capricious determinations of eligibility, are in violation of the equal protection requirements of the Fourteenth Amendment to the United States Constitution. The Plaintiffs further pray that appropriate injunctive relief be granted.

ECF No. 1 at pp. 33–36; *see also id*. at p. 37 ("The Defendants, by restricting licensure in the manner set forth in Counts I and II of this Complaint. . . are in violation of the dormant commerce clause.").

The court must therefore determine whether Plaintiffs have shown they suffered a concrete or imminent, particularized injury in fact caused by the above-described aspects of the licensing system that is "over and above the abstract generalized grievance suffered by all citizens of [Maryland] who (if [Plaintiffs are] right) must live in a State subject to an unconstitutional [license]

selection criterion." *Carney*, 592 U.S. at 59.  Plaintiffs have not made this showing; rather, their complained-of injury is precisely the type of generalized grievance described above.

In *Carney*, the Supreme Court found the plaintiff, a Delaware lawyer who identified as a political independent, lacked standing to challenge Delaware's requirement that judicial appointments to certain courts reflect a partisan balance between Democrats and Republicans because he had not applied for a judicial appointment.  592 U.S. at 61–63.  The Court determined that the plaintiff's "bare statement of intent alone"—that he "would apply for any judicial position"—was unavailing given the "context of a record that shows nothing more than an abstract generalized grievance."  *Id*. at 66.  Drawing on its precedent "that an injury in fact requires an intent that is concrete," the Court contrasted the plaintiff in *Carney* with plaintiffs in other cases who unsuccessfully applied for a position affected by the challenged policy or showed they regularly applied for similar positions; the latter group of plaintiffs satisfied Article III's injury-in-fact requirement by showing concrete intent instead of "some day intentions."  *Id*. at 64–66 (citing *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995); *Northeastern Fla. Chapter, Associated Gen. Contractors of America v. Jacksonville,* 508 U.S. 656, 666 (1993); *Gratz v. Bollinger*, 539 U.S. 244, 262 (2003)).

The Fourth Circuit, and this court, have also found plaintiffs failed to show an injury in fact when they sought to challenge an application process in which they had not participated.  *See, e.g.*, *S. Blasting Servs., Inc. v. Wilkes Cnty., NC*, 288 F.3d 584, 595 (4th Cir. 2002) (finding plaintiffs could not demonstrate actual injury because they "have never even applied for a permit, much less been denied one"); *Menders v. Loudoun Cnty. Sch. Bd.*, 65 F.4th 157, 163 (4th Cir. 2023) (holding plaintiffs failed to establish an Article III injury because they did not allege that they applied to the contested program).

The Supreme Court is clear, however, that Plaintiffs need not "translate" their desire for the license "'into a formal application' where that application would be merely a 'futile gesture.'" *Carney v. Adams*, 592 U.S. 53, 66 (2020) (quoting *Teamsters v. United States*, 431 U.S. 324, 365–366 (1977)). Plaintiffs can still show injury-in-fact if they were "able and ready" to apply and that "a discriminatory policy" prevented them from doing so on equal footing with competitors. *Jensen v. Maryland Cannabis Administration*, 719 F. Supp. 3d 466, 475 (D. Md. 2024) (citing *Gratz*, 539 U.S. at 262).

In *Jensen,* this court found that a plaintiff had standing to challenge the CRA's licensing requirements even without having submitted an application to the lottery because the plaintiff demonstrated she did not qualify as a social equity applicant. There, the plaintiff had submitted a "verification request" for certification as to whether she met the social equity criteria; and the MCA denied this request. This court found the plaintiff was not required to then submit the formal application that was available only to those who successfully verified their social equity eligibility. *Jensen*, 719 F. Supp. 3d at 475, 477 n.8.[8] This court additionally noted that plaintiff was "a successful retail cannabis professional who has applied for cannabis licenses in several states and was easily 'ready and able' to provide the business plans and other documentation the application required, had such an endeavor not been obviously doomed to fail." *Id.*

No Plaintiff ever applied for a Maryland recreational cannabis license. (ECF No. 1 ¶ 69.) They allege, however, that they are "willing, ready and able to apply for licenses if those licenses

---

[8] The *Jensen* court explained: "Plaintiff and Defendants agreed at the hearing that Plaintiff was unable to *submit* the formal application without first receiving social equity applicant verification, even if she could have *begun* that application without the verification. Plaintiff was well aware that she would not receive social equity verification, and she was not required to begin an application that would have obviously been a 'futile gesture' in order to establish injury." 719 F. Supp. 3d at 475 (emphasis in original). The court further made clear that Jensen had submitted a (pre-application) social equity verification request, which was declined: "[I]n Plaintiff's 'verification request,' she certified that she had no address to submit from a disproportionately impacted area, and the only academic transcripts she submitted were those from California State University at Long Beach." *Id.* at 477 n.8.

are granted via reasonable and objective criteria." *Id.* Plaintiffs acknowledge that to receive an application, there are two stages: first, qualify as a social equity applicant; and second, receive a license through the lottery system. *Id.* ¶ 36. But Plaintiffs do not allege that they sought to qualify as social equity applicants. Instead, they submit that "Plaintiffs have little or no prospect of obtaining a license in the first round of 'social equity' licensing." *Id.* ¶ 47. There are no allegations that any Plaintiff submitted a first-round social equity application or a final application. There are no allegations of any specific steps any Plaintiff took to qualify for a license.

Another troubling aspect of Plaintiffs' Complaint is the generalized nature of its allegations. "[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). The Complaint lacks specific allegations about the individual Plaintiffs' ability to qualify as social equity applicants. Instead, Plaintiffs allege that "some of them cannot obtain a license under any scheme the State has devised, and most likely will never obtain a license under any scheme the State has devised."[9] (ECF No. 6 at p. 19.)

In the Complaint, Plaintiffs allege:

> The Plaintiff retailers were and are willing to be licensed as recreational cannabis dispensaries if only for the purposes of continuing to sell their Federally legal Hemp Products, but the new Act made no provision for them to receive any licenses on a provisional, expedited or priority basis, nor did it give the retailers any grace period within which to even attempt to get a license. Instead, it shut them down without recourse.

(ECF No. 1 ¶ 62.)

---

[9] Plaintiffs' reference to "any scheme the State has devised" appears to refer to the CRA's definition of a social equity applicant as an one who "has at least 65% ownership and control by one or more individuals who" has lived or attended school in a disproportionately impacted area, or "(2) meets any other criteria established by the Administration." MD. CODE ANN., ALC. BEV. § 36-101(ff). While the CRA provides for other criteria, "the MCA has not adopted any additional criteria pursuant to this authority and therefore the provision has never been applied." (ECF No. 20 at p. 11 n.16.) Plaintiffs' vague assertion that they will not be able to apply pursuant to any future adopted criteria is wholly speculative and insufficient to show concrete or imminent injury.

In their reply memorandum, Plaintiffs assert:

> [M]any of these Plaintiffs were, by the State's own law, completely ineligible to apply for a license. Further, the Plaintiffs would have been required to submit to a licensing process that is itself speculative and conjectural, based upon a lottery – with a requirement to pay an onerous fee even if rejected. Under such a circumstance, the State cannot insist that one apply for a license in order to have standing.

(ECF No. 24 at p. 5.)

Plaintiffs thus suggest that the social equity applicant requirement (or any other of the challenged license application requirements) does not pose a barrier to licensure for some Plaintiffs; rather, they did not apply because the CRA did not allow them to receive the licenses on "a provisional, expedited, or priority basis." *Id*.

Plaintiffs fail to make clear which of them was "ineligible to apply" and why. Plaintiffs' general assertion that they "would have been required to submit to a licensing process that is itself speculative and conjectural" and "require[d] to pay an onerous fee even if rejected" is not an injury in fact. (ECF No. 24 at p. 5.) These same allegations are true of any Maryland citizen interested in the recreational cannabis license and its attendant privileges. *See Carney v. Adams*, 592 U.S. 53, 59 (2020) (explaining that "a plaintiff cannot establish standing by asserting an abstract 'general interest common to all members of the public'").

Contrary to Plaintiffs' assertion, neither the State nor this court calls for them to have applied for a license to show standing. Under Supreme Court and this court's precedent, however, Plaintiffs must at the very least show they were "able and ready" to apply for licensure and the allegedly discriminatory nature of the licensing criteria prevented them from doing so. As addressed above, Plaintiffs have not made a clear, Plaintiff-specific showing that they were each

able and ready to apply for licensure but did not do so because of the CRA's social equity applicant, numerical, or lottery requirements.

As for the second round of licensing, as set forth above, the application criteria will not be set until the MCA completes a disparity study. MD. CODE ANN., ALC. BEV. § 36-404(e)–(g). Plaintiffs admit that Senate Bill 215 does not alter this:

> [T]he General Assembly has passed new legislation as of 2025 re-affirming that the second round of licenses, depending upon the results of a study as to whether further social equity programs are needed, will either be awarded to minority and women owned businesses by lottery, or again, by a random lottery for the remaining licenses available.

(ECF No. 1 ¶ 50.) Plaintiffs do not allege any efforts to apply for the second round of licensing; nor could they inasmuch as the MCA has not yet determined the application criteria for the second round. *See Menders*, 65 F.4th 157 at 163 (finding plaintiffs lacked standing when they had not applied or even alleged they were prevented from participating in the program).

Plaintiffs lack standing to challenge the requirements of the CRA licensing process, as none of them applied for a license in the first round and they fail to show they were otherwise "able and ready" to do so as the applicable precedent describes. *See Jensen*, *supra*. Any effort to challenge the requirements for second-round applicants is premature, as the MCA has not yet determined what, if any, remedial measures they will employ in the lottery process for second round licenses.

### 2. *Plaintiffs Lack Standing to Challenge the CRA's Market Share Requirement*

Plaintiffs fair no better in demonstrating standing to challenge the CRA's requirement that licensed cannabis dispensaries "ensure that at least 25% of cannabis and cannabis products in the dispensary are from social equity licensees and growers and processors that do not share common ownership with the dispensary." MD. CODE ANN., ALC. BEV. § 36-410(a)(3). Plaintiffs repeatedly aver that they sell hemp, as opposed to cannabis, products. *See, e.g.*, ECF No. 1 ¶ 22 ("It is hemp,

rather than cannabis (which has much higher levels of Delta-9 THC) that is grown by the Plaintiff farmers in this case."); ECF No. 6 ¶¶ 1, 6, 7, 13, 25.

Plaintiffs fall far short of demonstrating a concrete, imminent injury from this requirement. First, as discussed above, there is no dispute that they are not currently licensed dispensaries, and they do not allege they sought to become licensed. Second, they repeatedly aver that they do not sell cannabis or cannabis products; and they do not allege that they sought to place their products in licensed dispensaries and the CRA shelf requirement prevented them from doing so.

In their reply memorandum, Plaintiffs suggest that the shelf space requirement applies to both cannabis and hemp products, and ask this court to enter "judgment by consent" or for the State to stipulate to the fact that it applies to only cannabis products. First, nothing in the plain language of the requirement indicates application to hemp products. Second, and determinatively, it is Plaintiffs' burden to establish standing to challenge the requirement in the first instance, which they fail to do. And while the State by all appearances declines the invitation to enter a consent decree, it bears mentioning that this court declines to enter judgment that the requirement does not apply to Plaintiffs when Plaintiffs offer nothing to suggest that the requirement has ever been applied to, or injured, them; or that such application and resultant harm is imminent.

### 3. Plaintiffs Lack Standing to Challenge Hemp Flower Searches and Seizures

Plaintiffs also fail to establish standing to challenge the alleged Hemp Flower searches and seizures. In pertinent part, Plaintiffs aver: "[s]everal hemp retailers in Baltimore City have been the subject of search and seizure warrants, and in at least one case, criminal charges for the sale of 'cannabis' based upon testing of the seized product." (ECF No. 6 ¶ 43.) Notably, Plaintiffs do not allege that any Plaintiff or Maryland Hemp Coalition member was a target of any such search and seizure. Instead, they insist, "Plaintiffs who engage in the sale of hemp flower have a reasonable

apprehension that they may be targeted for similar unlawful searches, seizures and enforcement actions, and seek an injunction and declaratory judgment that such seizures are unlawful." *Id*. ¶ 46. This does not come close to demonstration of concrete, particularized, imminent injury from law enforcement searches.

### 4. *Plaintiff Ira Cooke Lacks Standing*

The Complaint contains the following allegations regarding Plaintiff Ira Cooke:

> IRA COOKE is an individual who is a retired attorney and a cancer survivor who has suffered from digestive and appetite problems since the time of suffering esophageal cancer several years ago. He first became aware of the medicinal properties of Hemp Products during that ordeal, and has been a regular customer of the retail store operated by J. WYAND, INC., d/b/a SIMPLE PLEASURES. As a consumer of the product in question, he values friendly customer service, knowledgeable staff, and competitive pricing, which he has found at retail hemp establishments but has not found at state licensed cannabis dispensaries. He asserts his right as a consumer to buy from the retail stores of his choosing, rather than of the State of Maryland's choosing.

(ECF No. 1 ¶ 13.)

"When the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493–94 (2009). To meet this substantially more difficult burden, a plaintiff must "demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). A plaintiff does not "establish the required burden for standing purposes" when he alleges "minor inconveniences, additional costs and logistical hurdles" as these "do not constitute an 'absolute deprivation' of the plaintiff['s] rights." *N. Virginia Hemp & Agric., LLC v. Virginia*, 125 F.4th 472, 489–90 (4th Cir. 2025).

Here, Plaintiff Cooke is not the object of the CRA, as the CRA regulates sellers, not consumers, of cannabis.  Further, Plaintiff Cooke's alleged injury is that he cannot shop from the store of his choosing and instead has to shop from stores with worse customer service and higher prices.  These inconveniences and additional costs are not an injury sufficient to establish standing. *Id*.  Further, as explained above, Simple Pleasures does not allege it sought a license; therefore, Plaintiff Cooke's alleged injury is even further attenuated from the CRA than that of Plaintiff Simple Pleasures.  Moreover, the Complaint contains no allegation that Plaintiff Cooke sought METRC access or was subject to a search and seizure of hemp flower.  Accordingly, Plaintiff Cooke lacks standing as to Plaintiffs' claims related to the CRA, METRC or searches for/seizures of hemp products.

### 5.  *Plaintiff Maryland Hemp Coalition, Inc. Lacks Standing*

Membership organizations, like Plaintiff Maryland Hemp Coalition, Inc., may establish standing based on their own injury or based on their members' injuries; the latter standing basis is known as representational or associational standing.  *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023).

To show standing based on its own injury, an association or member organization "must satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 393–94 (2024) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982)).  "Like an individual, an organization may not establish standing simply based on the 'intensity of the litigant's interest.'"  *Id*.  (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State,* 454 U.S. 464, 486 (1982)).  Instead, the challenged actions must "directly affect[] and interfere[] with [the organization's] core business activities."  *Id*. at 395.  The Fourth Circuit has "reaffirmed that a

plaintiff has suffered an organizational injury if the challenged policy or practice frustrated both its purpose and caused a drain on its resources." *People for Ethical Treatment of Animals, Inc. v. Tri-State Zoological Park of W. Maryland, Inc.*, 843 F. App'x 493, 495 (4th Cir. 2021). The Supreme Court has warned, however, that "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Hippocratic*, 602 U.S. at 394.

Alternatively, a member organization may establish standing through its members' injuries. *Students for Fair Admissions*, 600 U.S. at 199. But, importantly, to establish associational standing, "an organization must 'make specific allegations establishing that at least one identified member has suffered or would suffer harm.'" *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009)).

Plaintiff Maryland Hemp Coalition, Inc., alleges it is "a member organization to forward the cause of farmers of hemp in the State of Maryland." (ECF No. 1 ¶ 4.) As for injury, it avers the "hemp grown by these farmers is used in many of the products sold by the various retailer Plaintiffs in this case. The diminution of the business of those retailers will also diminish the business of the hemp farmers of Maryland, contrary to the mission of the Maryland Hemp Coalition, Inc." *Id*.

Maryland Hemp Coalition's allegations are insufficient to establish standing based on either its own injuries or those of its members. It has not alleged both a frustration of its purpose and a related drain of its resources (*People for Ethical Treatment of Animals, Inc.*, *supra*); instead, its alleged harm amounts to a "mere disagreement with the policy decisions of the Maryland legislature, which is insufficient to meet the constitutional threshold for an injury in fact." *Md.*

*Shall Issue, Inc. v. Hogan*, 963 F.3d 356, 362 (2020).  Additionally, for the reasons discussed above, the other Plaintiffs in this action have not shown standing to challenge the CRA's licensing requirements, the other allegedly unconstitutional provisions of the CRA, or the recent enforcement actions against hemp growers, and Maryland Hemp Coalition lodges no specific allegations sufficient to demonstrate that at least one non-Plaintiff member has standing to challenge same.

"It is well established that standing is a threshold jurisdictional issue that must be determined first because without jurisdiction the court cannot proceed at all in any case." *Covenant Media of N.C., L.L.C. v. City of Monroe, N.C.*, 285 F. App'x 30, 34 (4th Cir. 2008) (citations omitted).  For the reasons set forth above, the court determines that Plaintiffs do not have standing to challenge the constitutionality of the CRA's licensure application, shelf-space requirements, or the recent hemp flower enforcement actions.

For the sake of completeness, the court proceeds to analyze the Motion assuming Plaintiffs could establish standing to pursue their claims.

### B.  Eleventh Amendment Sovereign Immunity

The State Defendants urge that Plaintiffs face an additional jurisdictional bar to their requested relief: sovereign immunity under the Eleventh Amendment.  The Eleventh Amendment provides that "the Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. CONST. amend. XI.  Under the Eleventh Amendment, states generally enjoy immunity from suit unless a state waives its immunity, or the immunity is abrogated by Congress.  *See Board of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363–64 (2001) (providing that "[t]he ultimate guarantee of the Eleventh

Amendment is that nonconsenting States may not be sued by private individuals in federal court. We have recognized, however, that Congress may abrogate the States' Eleventh Amendment immunity when it both unequivocally intends to do so and acts pursuant to a valid grant of constitutional authority" (citations omitted)); *Passaro v. Virginia*, 935 F.3d 243, 247 (4th Cir. 2019) (holding "state sovereign immunity bars all claims by private citizens against state governments and their agencies, except where Congress has validly abrogated that immunity or the state has waived it").

Eleventh Amendment immunity applies to instrumentalities of the state, and to state officials sued in their official capacities. *Eller v. Prince George's Cnty. Pub. Sch.*, 580 F. Supp. 3d 154, 167 (D. Md. 2022); *see Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). Here, the State Defendants undisputedly fall into those two categories. Defendants Maryland Cannabis Administration and the Maryland Alcohol, Tobacco, and Cannabis Commission are instrumentalities of the state of Maryland. Defendants the Governor of Maryland, as well as the Executive Directors of the MCA and the MATCC are state officials sued in their official capacities. Accordingly, unless one of three exceptions—abrogation, waiver, or *Ex Parte Young*—applies, all of the State Defendants enjoy sovereign immunity, and this court lacks jurisdiction over this action to the extent it pursues them as defendants. *Medigrow, LLC v. Natalie M. LaPrade Medical Cannabis Comm.*, 487 F. Supp. 3d 364, 372 (D. Md. 2020).

With respect to abrogation, "Congress has not abrogated sovereign immunity for § 1983 suits." *Biggs v. N. Carolina Dep't of Pub. Safety*, 953 F.3d 236, 241 (4th Cir. 2020) (citing *Quern v. Jordan*, 440 U.S. 332, 345 (1979)). As for the second exception, waiver, Maryland has neither waived its sovereign immunity nor consented to suit in federal court. *Id*. The only remaining question is whether, pursuant to *Ex Parte Young*, Plaintiff has identified and sought "equitable

relief from an ongoing violation of federal law." *Allen v. Cooper*, 895 F.3d 337, 354 (4th Cir. 2018) *aff'd*, 589 U.S. 248 (2020).

Pertinent to this action, "suits for 'prospective injunctive relief against state officials acting in violation of federal law' are permitted" pursuant to *Ex Parte Young*, 209 U.S. 123 (1908). *Eller*, 580 F. Supp. 3d at 168. "Under this limited exception, a federal court may issue prospective, injunctive relief against a state official to prevent ongoing violations of federal law, such as when the state officer is enforcing, or threatening to enforce, an allegedly unconstitutional state law." *Id*. "To invoke the exception, the plaintiff must identify and seek prospective equitable relief from an ongoing violation of federal law." *Allen*, 895 F.3d at 354.

Plaintiffs' requests for declaratory and injunctive relief are not related to state officials or an ongoing violation of federal law; thus, *Ex Parte Young* does not apply.[10] Much of Plaintiffs' requested relief relates to "The State of Maryland's" policies and is not connected to the Defendant State officials. *See, e.g.*, ECF No. 1 at pp. 33–35 (requesting this court enter declaratory judgment that "The State of Maryland social equity restrictions…"; "The State of Maryland numerical restrictions…"; "The State of Maryland 'lottery system'…"; "the State policies denying access to the METRC system…"; "The requirement of a 'detailed diversity statement' and business plan…"; "[T]he State policies allowing the sale of…" violate the Fourteenth Amendment). "The *Ex Parte Young* exception only permits actions against state officials, not the State itself or its instrumentalities." *Medigrow*, 487 F. Supp. 3d at 373.

---

[10] Defendants aver that Plaintiffs seek only declaratory relief; Plaintiffs respond that because they seek injunctive relief in the Motion, it is irrelevant that the relief requested in the underlying claim is declaratory relief. Plaintiffs are incorrect. Eleventh Amendment sovereign immunity is jurisdictional; it cannot be "deferred for a merits trial," as Plaintiffs request. (ECF No. 24 at p. 5.) Because Plaintiffs include requests for injunctive relief along with their request for declaratory relief on each count, the court reads the Complaint to seek both declaratory and injunctive relief.

To the extent Plaintiffs intend to bring their claims related to licensure against Defendant Tabatha Robinson, the Executive Director of the MCA, *Ex Parte Young* still does not apply as there is no alleged ongoing violation of federal law. The MCA has already completed issuing the first-round licenses. "No federal court may issue a declaratory judgment on past state action, where the action complained of and no other relief [i.e. injunctive relief] is available." *Int'l Coal. For Religious Freedom v. Maryland*, 3 F. App'x 46, 50 (4th Cir. 2001). Plaintiffs seek declaratory judgment that the licensure requirements, as applied in the first round, violated the Fourteenth Amendment and the dormant Commerce Clause; this requested relief is retrospective in nature.

Plaintiffs' claims against Defendants Maryland Alcohol, Tobacco, and Cannabis Commission, and its executive director, Jeffrey A. Kelley, and Richard Worley, as commissioner of the Baltimore City Police Department arise from "[t]he selective enforcement of erroneous testing standards, contrary to State and Federal Regulations as to hemp flower products, against the hemp retailers and not against the state licensed dispensaries." (ECF No 1 at p. 35.) In view of the court's above determination that Plaintiffs do not have standing to pursue their claims related to these alleged searches and seizures, the court does not here address whether *Ex Parte Young* applies to Plaintiffs' claims as against Defendant Kelley.[11]

Finally, the State Defendants argue Wes Moore, in his official capacity as Governor of Maryland is not a proper defendant to this action. The court agrees that Plaintiffs are unlikely to show Governor Moore is an appropriate Defendant. The Fourth Circuit has made clear that "[t]he mere fact that a governor is under a general duty to enforce state laws does not make him a proper defendant in every action attacking the constitutionality of a state statute." *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 331 (4th Cir. 2001) (quotations omitted). Instead, "to be a proper

---

[11] As stated above, the court addresses Defendant Worley's pending Motion to Dismiss separately.

defendant in an action to enjoin an allegedly unconstitutional state law, the governor must have 'a specific duty to enforce' that law." *Disability Rts. S.C. v. McMaster*, 24 F.4th 893, 901 (4th Cir. 2022) (quoting *Waste Mgmt.*, 252 F.3d at 331).  Governor Moore has no specific duty to enforce the CRA, and Plaintiffs do not argue otherwise.

Accordingly, the Eleventh Amendment bars Plaintiffs' claims as against Defendants Maryland Cannabis Administration, the Maryland Alcohol, Tobacco, and Cannabis Commission, and the State of Maryland.  Additionally, Governor Wes Moore is not a proper party to this action. As described above, despite the jurisdictional bars of standing and immunity, the court nonetheless addresses the *Winter* factors below.

## C. Likelihood of Success on the Merits

### 1. Equal Protection Claim

In their first cause of action, Plaintiffs allege "[t]he present Maryland Cannabis Reform Act, in its social equity restrictions, set asides for minority and women business applicants, numerical restrictions upon licensure, and licensure by lottery, violated the rights of Plaintiffs to equal protection of the laws under the Fourteenth Amendment."  (ECF No. 1 ¶ 108.)

As the Fourth Circuit has explained,

> [E]qual protection "is essentially a direction that all persons similarly situated should be treated alike." *See City of Cleburne v. Cleburne Living Ctr.*, Inc., 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Thus, a plaintiff challenging a state statute on an equal protection basis "must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *See Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001) (citing *City of Cleburne*, 473 U.S. at 439-40, 105 S.Ct. 3249). If that initial showing has been made, "the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." *Id*. At that step, a court generally presumes that the statute is valid and will reject the challenge "if the classification drawn by the statute is rationally

related to a legitimate state interest." *See City of Cleburne*, 473 U.S.
at 440, 105 S.Ct. 3249.

*Kolbe v. Hogan*, 849 F.3d 114, 146 (4th Cir. 2017), *abrogated on other grounds by New York State*

*Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022).

Here, the CRA discriminates between similarly situated people by screening license

applicants for social equity status defined as follows:

> An applicant for a cannabis license or cannabis registration that
> (1) has at least 65% ownership and control held by one or more
> individuals who:
>
> (i) have lived in a disproportionately impacted area for at least 5 of
> the 10 years immediately preceding the submission of the
> application;
> (ii) attended a public school in a disproportionately impacted area
> for at least 5 years; or
> (iii) for at least 2 years, attended a 4-year institution of higher
> education in the State where at least 40% of the individuals who
> attend the institution of higher education are eligible for a Pell Grant;

MD. CODE ANN., ALC. BEV. § 36-101(ff).

The court notes, however, that people who do not fit this description may still own licensed

businesses provided 65% of the ownership of the company qualifies as set forth above. *Id*. The

above criteria do not, as Plaintiffs assert, discriminate between (otherwise) similarly situated

applicants on the basis of race or gender. Senate Bill 215 does not alter the CRA's provision that

for the second round of licensing, if the MCA, in cooperation with other State agencies,

"determines that a disparity study demonstrates a strong basis in evidence of business

discrimination against firms owned by minorities and women in the Maryland cannabis market,"

it shall issue the second-round licenses "applying minimum licensing qualifications and employing

remedial measures consistent with constitutional requirements." *Id*. § 36-404(e)–(g); 2025 Md.

Law ch. 120. The State Defendants assert that the MCA has not yet completed this study or

determined whether it will employ remedial measures in issuing the licenses. (ECF No. 20 at p. 18.) Plaintiffs concede that the second round of licensing depends on the result of the study. (ECF No. 1 ¶ 50.)

The CRA is clear that if the disparity study "does not demonstrate a strong basis in evidence of business discrimination against firms owned by minorities and women in the Maryland cannabis market, the Administration shall enter each applicant that meets the minimum qualifications established by the Administration into a lottery[.]" MD. CODE ANN., ALC. BEV. § 36-404(g)(1). In short, the current (or, more accurately, the most recently established) licensing system does not (and did not) discriminate on grounds of race or gender. To the extent the second round contemplates discriminating on these grounds, any challenge is premature – the MCA has not decided whether it will consider these factors. Therefore, the court is not in a position to examine any potential action (or inaction) of the MCA or the potential reasons for same.

Where, as here, a plaintiff has not alleged that he was deprived of a fundamental right or subjected to discrimination based on a suspect classification, the court will uphold a challenged classification so long as it is rationally related to a legitimate state interest. Rational basis scrutiny is highly deferential; "a government entity 'need not actually articulate at any time the purpose or rationale supporting its classification,' and it is not required to produce evidence showing the rationality of its classification." *Pulte Home Corp. v. Montgomery Cnty.*, 909 F.3d 685, 693 (4th Cir. 2018) (quoting *Heller v. Doe*, 509 U.S. 312, 320 (1993)).

The State Defendants submit that "[t]he Legislature designed the criteria by which one may qualify as a Social Equity Applicant to direct the economic benefit of cannabis legalization towards those communities that suffered disproportionate harms in the course of cannabis prohibition;" and "the criteria are designed to reach those who lived in and attended schools in areas with

disproportionately high rates of cannabis arrests." (ECF No. 20 at p. 36.) While Plaintiffs repeatedly insist that the State has no rational basis for choosing to construct the licensing system in the way set forth in the CRA, their protestations amount to distaste for the State's policy choices. *See* ECF No. 1 ¶ 105 ("There is no rational basis for conducting the issuance of such licenses based upon social equity or minority and women owned business preferences."); *id*. ¶ 39 ("The social equity factors and geographical factors considered for social equity status have no rational relationship to any public safety or health concerns.").

Plaintiffs' dissatisfaction with the Social Equity Applicant criteria does not amount to a showing that they are likely to succeed on their equal protection claim. "[E]qual protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). The State Defendants provide reasons why the State defined Social Equity Applicants in the manner it did, and these reasons rationally relate to the State's articulated aims. "In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Id*. Plaintiffs fail to make a showing they are likely to succeed on the merits of their equal protection claim.

To the extent Plaintiffs' equal protection claim rests not on the social equity applicant criteria, but instead on the CRA's numerical restrictions, use of a lottery, or diversity statement and business plan requirements, Plaintiffs do not even allege that these aspects of the CRA discriminate between potential applicants at all – because they do not do so. Said differently, these aspects of the CRA are equally applicable to all. Similarly, the CRA does not discriminate between

classes of people eligible to grow, sell, or distribute edible cannabis.[12]  Plaintiffs are unlikely to succeed on any equal protection claim rooted in these provisions.

Regarding the MCA's restriction of METRC access to licensees only, METRC access is not a fundamental constitutional right; nor are non-licensees a suspect class.  The State Defendants submit that "Plaintiffs are not permitted access to MCA's METRC system because they are not licensed, and therefore MCA is not tracking the products they cultivate and sell."  (ECF No. 20 at p. 20–21.)  Against the backdrop of the highly deferential degree of scrutiny applicable here, Plaintiffs are unlikely to succeed on an equal protection claim based on METRC access.[13]

Plaintiffs are unlikely to succeed on the merits of their Fourteenth Amendment equal protection claim.

### 2. *Due Process Claim*

The Due Process clause—that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law"—"provides heightened protection against government interference with certain fundamental rights and liberty interests."  *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997); U.S. CONST. amend. 14, § 1.

Plaintiffs do not argue that they possess a fundamental right to sell hemp products.  (ECF No. 24 at p. 10 ("Plaintiffs have never claimed there is a fundamental right to sell THC products.").)  As set forth above, where neither a fundamental right nor suspect classification is at issue, "[t]he law should be upheld unless there is no 'reasonably conceivable state of facts that could provide a rational basis for [the statute].'"  *Prynne v. Settle*, 848 F. App'x 93, 106 (4th Cir.

---

[12] Plaintiffs allege that Maryland allows only licensed cannabis dispensaries to sell edible cannabis products.  The State Defendants dispute this allegation.  While Maryland regulates certain qualities of edible cannabis products, it does not restrict the retail of same to licensed dispensaries.  Plaintiffs cite no State law or regulation stating otherwise.
[13] The court will not expend space to address Plaintiffs likelihood of success on their equal protection claim based on alleged discriminatory searches and seizures of hemp flower products.  Plaintiffs do not allege they were subject to any of these searches, and they do not specifically allege the circumstances of the searches they reference.  Plaintiffs fail to demonstrate standing to pursue any claims arising from these searches.

2021).  For all of the reasons set forth above, the State has shown a rational basis for its policy choices embodied in the CRA, as well as its various other policy choices challenged here.  As such, Plaintiffs are unlikely to succeed on their due process claim.

### 3. *Dormant Commerce Clause Claim*

In their third cause of action, Plaintiffs allege the CRA's restrictions on licensure and on who may sell THC beverages and edible products, as well as Defendants' "selective enforcement of erroneous testing standards," and the MCA's limits on METRC access infringe the dormant commerce clause.

The Commerce Clause of the Constitution empowers Congress "[t]o regulate Commerce . . . among the several States."  U.S. CONST. art I, § 8, cl. 3.  The Supreme Court has long recognized that the Commerce Clause also contains a "negative implication"—the dormant Commerce Clause—that "prohibits state laws that unduly restrict interstate commerce."  *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337 (2008); *Tenn. Wine & Spirits Retailers Assoc. v. Thomas*, 588 U.S. 504, 514 (2019).  The dormant Commerce Clause is "driven by concern about 'economic protectionism, that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors."  *Davis*, 553 U.S. at 337–38 (quoting *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273–74 (1988)).  "The dormant Commerce Clause restrains 'the several States' by limiting 'the power of the States to erect barriers against interstate trade.'"  *McBurney v. Young*, 667 F.3d 454, 468–69 (4th Cir. 2012) *aff'd*, 569 U.S. 221 (2013) (quoting *Dennis v. Higgins*, 498 U.S. 439, 446 (1991)).

When presented with a dormant Commerce Clause challenge to state economic regulation, the court must first determine "whether [the] challenged law discriminates against interstate commerce.'"  *Davis*, 553 U.S. at 338.  In this context, discrimination "simply means differential

treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Or. Waste Sys., Inc. v. Dep't of Env't Quality*, 511 U.S. 93, 99 (1994).  A law may be discriminatory "facially, in its practical effect, or in its purpose." *Just Puppies, Inc. v. Frosh*, 565 F. Supp. 3d 665, 715 (D. Md. 2021), *aff'd sub nom. Just Puppies, Inc. v. Brown*, 123 F.4th 652 (4th Cir. 2024).  If it discriminates against interstate commerce, a law is 'virtually *per se* invalid,'" and can survive the challenge "only if it 'advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives.'" *Davis*, 553 U.S. at 338 (quoting *Or. Waste Sys.,* 511 U.S. at 101).  "[N]ondiscriminatory regulations that have only incidental effects on interstate commerce are valid unless 'the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.'" *Or. Waste Sys., Inc.*, 511 U.S. at 99 (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).

In-state Plaintiffs Charm City Hemp, Peace of Sunshine, Straf, Daniel Simmonds, Cannon Apothecary, the Unlimited Experience Holding Company, the Maryland Hemp Coalition, and Ira Cooke's claims amount to allegations that the CRA and the State's other complained of policies harm their businesses while providing advantages to other, in-state businesses.  "To the extent that [a challenged State law] burdens in-state actors, these harms do not implicate the dormant Commerce Clause, which is concerned with preventing states from boosting in-state business, not impeding it." *Just Puppies, Inc v. Frosh*, 457 F. Supp. 3d 497, 512 (D. Md. 2020) (citations omitted).  Even when a challenged law "provides a boon to some in-state actors at the expense of others," the dormant Commerce Clause is not implicated; "the constitution freely permits such intra-state economic favoritism." *Id*.

The remaining, out-of-state Plaintiffs, Endo, J. Wyand, and South Mountain Microfarm, also fail to show a likelihood of success on their dormant Commerce Clause claim.[14]  Plaintiffs do not allege that the CRA discriminates between in-state and out-of-state applicants on its face. Plaintiffs also have not proffered a discriminatory effect of "caus[ing] local goods to constitute a larger share, and goods with an out-of-state source to constitute a smaller share, of the total sales in the market." *Exxon Corp. v. Governor of Md.,* 437 U.S. 117, 126 n.16 (1978).[15]  The CRA and the State's other challenged policies apply to in-state actors and out-of-state actors equally.[16] Plaintiffs have also not set forth any evidence that Maryland acted with a discriminatory purpose in passing the CRA or pursuing any of the other complained actions.[17]

Because Plaintiffs have not set out facts that could demonstrate that the CRA is discriminatory, to show a likelihood of success, they must offer facts that could reasonably establish the challenged law "indirectly burdens interstate commerce" and "the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Or. Waste*

---

[14] While Plaintiff South Mountain Microfarm is a Maryland corporation (ECF No. 1 ¶ 8), it has "a THC beverage under development in its West Virginia facility that is ready to begin distribution . . . and wishes to distribute that product through hemp retailers in the State of Maryland."  *Id*. ¶ 81.

[15] In the Complaint, Plaintiffs allege "[t]he regulations as applied further discriminate against Plaintiffs and Hemp sellers in favor the state licensed Cannabis dispensaries because the latter are allowed to obtain hemp products, including chocolates, gummies, and THC infused beverages, enter them into the METRC system, and sell them, while the State of Maryland actively thwarts attempts by the Plaintiffs to do so."  (ECF No. 1 ¶ 103.)  Plaintiffs' complaint is in effect that Defendants have discriminated against individual actors in commerce; this does not amount to a dormant Commerce Clause violation.  The dormant Commerce Clause "protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations."  *Exxon*, 437 U.S. at 127–28.  Plaintiffs lodge no allegations about the effect of the challenged laws and policies on the overall market shares of in-state and out-of-state goods.

[16] The CRA does not, for example, require that applicants reside in Maryland.  In this way, it is distinct from the state laws at issue in two cases Plaintiffs cite: *Northeast Patients Group v. United Cannabis Patients and Caregivers of Maine*, 45 F.4th 542 (1st Cir. 2024), and *Lowe v. City of Detroit*, 544 F. Supp. 3d 804 (E.D. Mich. 2021).  This case is also distinct from a third dormant Commerce Clause case Plaintiffs cite, *Loki Brands v. Platkin*, 2024 WL 4457485 (D.N.J. 2024).  Unlike the facts of *Loki*, neither the CRA nor any other Maryland regulation defines or categorizes hemp based on where it was cultivated or processed.  *See Loki*, 2024 WL 4457485 at *10 (finding that the inclusion of "in this State" to the definition of "Intoxicating Hemp Product" created "disparate treatment between hemp cultivate din New Jersey and hemp derived from outside New Jersey.").

[17] Even if Plaintiffs could show Maryland acted with discriminatory purpose, "it is not entirely clear whether sinister purpose *alone* suffices to violate the dormant Commerce Clause."  *Just Puppies*, 565 F. Supp. 3d at 723.

*Sys.*, 511 U.S. at 99.  Plaintiffs have not made this showing.  They have neither shown nor described an indirect burden to interstate commerce; and therefore likewise fail to mount a showing that any such burden is outweighed by the local benefits of a well-regulated cannabis market.

It appears that Plaintiffs' dormant Commerce Clause claim is rooted in "the new Cannabis Reform Act amendments [Senate Bill 215] which are to be implemented on July 1, 2025" that "allow only licensed dispensaries to sell THC infused beverages, and those beverages are required to be obtained from Maryland licensed processors."  (ECF No. 6 ¶ 51.)  Defendants insist that Senate Bill 215 "affects only what will be able to be sold in on-site consumption lounges when those businesses are licensed" (ECF No. 20 at p. 5), thus it does not "completely close[]" the THC infused beverage market to out-of-state retailers.  Plaintiffs categorically fail to show (or proffer any evidence) that Senate Bill 215 – which, to be clear, merely adds on-site consumption licenses to future licensing rounds and defines the beverages that these future on-site consumption locations may retail – discriminates against out-of-state commerce.

Finally, while not raised by the parties, in *Jensen*, this court recently addressed the applicability of the dormant Commerce Clause to recreational marijuana regulation generally, and the CRA specifically.  This analysis bears repetition in full:

> Though it is admittedly a close call, this Court now joins with those courts across the country that have found that the dormant Commerce Clause does not apply to state recreational cannabis laws. In so doing, this Court finds Judge Gelpí's dissent in Northeast Patients Group particularly persuasive. As Judge Gelpí said, there may be an interstate market in recreational cannabis, but the fact this market is illegal makes it fundamentally distinct from interstate markets for other goods and renders it "constitutionally different in kind." *Northeast Patients Grp.*, 45 F.4th at 558–59 (Gelpí, J., dissenting). The dormant Commerce Clause seeks to "preserve a national market for competition undisturbed by preferential advantages conferred by a State upon its residents or resident competitors" because such an unencumbered market is presumably in the public interest, but this goal is not served by encouraging such

a market for a good that Congress has already expressly declared to be illegal and against the public interest. *Id.* (Gelpí, J., dissenting) (citing *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 299, 117 S.Ct. 811, 136 L.Ed.2d 761 (1997)). Put simply, it defies common sense to find that the dormant Commerce Clause, drawn from Congress' power to regulate interstate commerce, prevents the states from passing laws which inhibit a market which Congress has already declared prohibited. As the District Court for the Northern District of New York explained, applying the dormant Commerce Clause to the recreational cannabis market "would only encourage out-of-state participation in the [in-state] cannabis market, which would be contrary to Congress' exercise of Commerce Clause power in enacting the [Controlled Substances Act]." *Variscite NY Four, LLC*, 2024 WL 406490, at *12.

This conclusion is further bolstered by an additional logical inconsistency that would result from the dormant Commerce Clause's application to the federally illegal cannabis market. It is established that Congress can authorize states to discriminate against interstate commerce. *See S.-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 87–88, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984) (explaining that "Congress may redefine the distribution of power over interstate commerce by permitting the states to regulate the commerce in a manner which would otherwise not be permissible." (internal citation omitted) (cleaned up)). If the dormant Commerce Clause applies to recreational cannabis laws, however, the only way Congress could so authorize the states would be to "speak out of both sides of its mouth on this issue, simultaneously illegalizing marijuana while affirmatively granting states the power to 'burden interstate commerce in a manner which would otherwise not be permissible.'" *Northeast Patients Grp.*, 45 F.4th at 559 (Gelpí, J., dissenting) (quoting *New England Power Co. v. New Hampshire*, 455 U.S. 331, 341, 102 S.Ct. 1096, 71 L.Ed.2d 188 (1982)). This contradiction further supports a finding that the dormant Commerce Clause does not apply to the federally illegal recreational cannabis market.

*Jensen*, 719 F. Supp. 3d 483–84. In view of Judge Hurson's recent, thorough analysis, the court is further unpersuaded of Plaintiffs' likelihood of success on the merits of their dormant Commerce Clause claim.

### 4. *Doctrine of Laches*

Even had Plaintiffs adequately established standing, and even were Defendants not entitled to sovereign immunity, and even had Plaintiffs demonstrated a likelihood of success on the merits of their claims, the doctrine of laches would prevent entry of Plaintiffs' requested relief.  In their reply memorandum, Plaintiffs assert the doctrine of laches is inapplicable because Senate Bill 215 only became law in July 2025, and the challenged enforcement actions, which "are the primary impetus for this filing," occurred in spring of 2025. (ECF No. 24 at p. 5.)

The doctrine of laches is an affirmative defense to claims for equitable relief and requires the defendant "to prove two elements: '(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense.'"  *Perry v. Judd*, 471 F. App'x 219, 224 (2012) (quoting *Costello v. United States*, 365 U.S. 265, 282 (1961)).  To establish the first element, lack of diligence, a defendant must show that plaintiff "delayed inexcusably or unreasonably in filing suit."  *White v. Daniel*, 909 F.2d 99, 102 (4th Cir. 1990).  The second element—prejudice to defendant—exists when a defendant shows "a disadvantage on the part of the defendant in asserting or establishing a claim right or some other harm caused by detrimental reliance on the plaintiff's conduct."  *Id*.

Here, Plaintiffs filed the instant action almost two years after the effective date of the CRA. Plaintiffs challenge the application process and issuance of licenses, but their lawsuit comes eighteen months after the deadline for applications and over a year after the lotteries awarding licenses.  Thus, to the extent they challenge the first round of licensing, they have unreasonably delayed in bringing the challenge.  *See Perry*, 471 F. App'x at 228 (affirming doctrine of laches applied where movant delayed in bringing suit for four months after applicable deadline).[18]  The

---

[18] Additionally, in *Jensen v. Maryland Cannabis Administration*, this court found the plaintiff's delay of two months after submitting her Social Equity Applicant verification and four months after learning of the licensing program to

enactment of Senate Bill 215 does not remedy this delay.  The Bill merely amends aspects of a future licensing round; it does not alter the application process set forth in the 2023 law.

Defendants also satisfy the second element – a disadvantage or other harm caused by detrimental reliance on the plaintiff's conduct.  Plaintiffs' failure to timely challenge the CRA in this court before the close of the application process, lottery, or issuance of licenses resulted in the MCA and the State expending considerable resources to roll out and implement an entirely new licensing scheme for cannabis dispensaries in Maryland, including conducting reviews, reading applications, and administering the lottery.  (ECF No. 20-13 ¶ 5.)  For this court to declare the licensing system unconstitutional now, years after the application and lottery processes have concluded, would cause material, specific, avoidable prejudice to the State Defendants, and, while not determinative, the court notes, would also prejudice the licensees.

The court concludes that to the extent Plaintiffs challenge the 2023 CRA and first round of licensing set forth in, and carried out pursuant to, same, the doctrine of laches bars the issuance of equitable relief.  This conclusion is not altered by Plaintiffs' allegations regarding Senate Bill 215 or recent enforcement actions, as Plaintiffs lack standing to challenge both.

Upon finding Plaintiffs unlikely to succeed on the merits of their claims, the court's analysis may conclude as Plaintiffs are required to satisfy all four *Winter* factors for entry of a preliminary injunction.  Despite the myriad reasons set forth above why the court will not grant the requested preliminary injunction, the court addresses the remaining *Winter* factors below for completeness.

---

bring suit tipped the balance of equities against entry of a preliminary injunction.  719 F. Supp. 466, 479 (D. Md. 2024).  The court noted that, "[w]hile Plaintiff waited to file this suit, Defendants were processing applications, and individuals were applying for Maryland retail cannabis licenses. Defendants have dedicated hundreds of thousands of dollars and hundreds of staff hours to processing nearly 2,000 applications from individuals hoping for a license. Defendants' expenditure of time and resources contrasted with Plaintiff's unhurried filing schedule and complete lack of significant financial or other resources expended on the application strongly suggest that the balance of equities weighs against the granting of the requested injunction." *Id*. at 479–80.  The same is true here.

**D.  Plaintiffs Have Not Shown They Are Likely to Face Irreparable Harm Absent the Preliminary Injunction**

A plaintiff may satisfy the irreparable harm prong by showing a likely constitutional violation.  *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021); *Jensen v. Maryland Cannabis Administration*, 719 F. Supp. 3d 466, 478 (D. Md. 2024).  Here, Plaintiffs allege that Defendants violated their Equal Protection and Due Process rights, as well as their rights under the dormant Commerce Clause.  For the reasons set forth above, the court finds Plaintiffs have not shown that the State Defendants likely violated the Constitution.  Accordingly, they have also not shown they risk irreparable harm stemming from constitutional violations.

Plaintiffs allege they face irreparable harm from "the onerous prospect of not being able to sell the same products sold by the state licensed dispensaries, such as chocolates, gummies, and THC infused beverages" and from "the prospect of unfair enforcement proceedings, including prospective criminal charges."  (ECF No. 6 at p. 29.)

As the Supreme Court has "frequently reiterated," plaintiffs seeking preliminary injunction must "demonstrate that irreparable injury is *likely* in the absence of an injunction."  *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008) (collecting cases and citing 11A WRIGHT & MILLER'S FEDERAL PRACTICE AND PROCEDURE § 2948.1 (3d. ed.)  (explaining that an applicant must demonstrate that, in the absence of a preliminary injunction, "the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered" and that "a preliminary injunction will not be issued simply to prevent the possibility of some remote future injury")).  "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Id.*

The State Defendants assert that the MCA has not yet completed the disparity study required by the CRA to set the criteria for the second round of licensing. (ECF No. 20 at p. 18.) Plaintiffs do not dispute that this study is in progress and that the second round of licensing has not yet commenced. (ECF No. 1 ¶ 50.) Senate Bill 215 does not otherwise alter the law concerning sale of edible cannabis products. It is therefore unclear to the court how, if at all, Plaintiffs face irreparable harm of the sort described from its passage. As to the alleged irreparable harm from prospective enforcement proceedings, Plaintiffs make no showing to persuade the court that they are likely to be subject to the enforcement proceedings they vaguely describe. That law enforcement has recently conducted searches and seizures in the Baltimore area, and brought charges where they found violations of state law, does not support the extraordinary remedy Plaintiffs request.

### E. The Balance of Equities and the Public Interest Weigh Against Granting the Preliminary Injunction

"When a plaintiff seeks preliminary injunctive relief against the Government, the balance of the equities and the public interest factors merge." *Coreas v. Bounds*, 451 F. Supp. 3d 407, 429 (D. Md. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). "This is so because 'the government's interest *is* the public interest' in such a case." *Jensen*, 719 F. Supp. 3d at 478 (emphasis original) (quoting *Ass'n of Cmty. Cancer Ctrs. v. Azar*, 509 F. Supp. 3d 482, 501 (D. Md. 2020)).

Plaintiffs correctly assert that a state is not harmed by the entry of a preliminary injunction "which prevents the state from enforcing restrictions likely to be found unconstitutional," and that the entry of same is in the public's interest. *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 336, 346 (4th Cir. 2021). Plaintiffs offer no other reasons why entry of a preliminary injunction furthers the public interest. Here, as set forth in detail above, the court is

not persuaded that Plaintiffs have made a showing of likely success on the merits and thus have not shown the balance of equities and public interest favor entry of a preliminary injunction.

## IV.    CONCLUSION

For the reasons set forth above, by separate order, Plaintiffs' Motion for Preliminary Injunction (ECF No. 6) shall be denied.


/S/

July 30, 2025                                          _____
                                                      Julie R. Rubin
                                                      United States District Judge